UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

OKIA FERGUSON,

    *Plaintiff*,

v.

KILOLO KIJAKAZI,

    *Defendant.*[1]

No. 21-cv-1201 (DLF)

**MEMORANDUM OPINION**

Plaintiff Okia Ferguson, on behalf of her minor son K.J., challenges the Social Security Administration's (SSA's) denial of K.J.'s claims for Supplemental Security Income benefits. Before the Court are Ferguson's Motion for Judgment of Reversal, Dkt. 13, and the Social Security Commissioner's Motion for Judgment of Affirmance, Dkt. 16. For the reasons that follow, the Court will grant the Motion for Judgment of Reversal and deny the Motion for Judgment of Affirmance.

**I.   BACKGROUND**

    **A.   Statutory and Regulatory Background**

"To qualify for disability insurance benefits and supplemental security income under Titles II and XVI of the [Social Security] Act, [a claimant] must establish that []he is 'disabled.'" *Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004). The Act considers a minor disabled if he "has a medically determinable physical or mental impairment resulting in marked and severe functional limitations" that is either fatal or will last for more than one year. 42 U.S.C. § 1382c(a)(3)(C)(i);

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kililo Kijakazi, the acting director of the Social Security Administration, has been substituted for Andrew Saul as defendant.

*accord* 20 C.F.R. § 416.906.  A minor cannot be considered disabled if he "engages in substantial gainful activity."  42 U.S.C. § 1382c(a)(3)(C)(ii).

For child claimants, the Commissioner uses an "abbreviated version" of its normal five-step process to determine whether the claimant is disabled.  *Sullivan v. Zebley*, 493 U.S. 521, 526 (1990); *see* 20 C.F.R. § 416.924.  First, the claimant must show that he is not "doing substantial gainful activity."  20 C.F.R. § 416.924(a), (b).  Second, he must demonstrate that his impairment is "severe," as opposed to a "slight abnormality . . . that causes no more than minimal functional limitations."  *Id.* § 416.924(a), (c).  Third, the claimant must show that his impairments "meets, medically equals, or functionally equals" one of the listings at 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.* § 416.924(a), (d).  If he does, and the impairment "meets the duration requirement," then the Commissioner will deem the child disabled.  *Id.* § 416.924(d).  But "[i]f a child cannot qualify under these listings," or his impairment does not meet the duration requirement, then "he is denied benefits."  *Zebley*, 493 U.S. at 526.  "There is no further inquiry corresponding to the fourth and fifth steps of the adult test."  *Id.*

The listing relevant here is Listing 112.10, which describes autism spectrum disorder for children aged three to eighteen.  To meet or medically equal the severity of the impairment in the listing, the child must show "[m]edical documentation of both . . . (1) [q]ualitative deficits in verbal communication, nonverbal communication, and social interaction; and (2) [s]ignificantly restricted, repetitive patterns of behavior, interests, or activities."  20 C.F.R. pt. 404, subpt. P, app. 1, § 112.10 (emphasis omitted).  In addition, the child must also establish "[e]xtreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

    (1) Understand, remember, or apply information.
    (2) Interact with others.
    (3) Concentrate, persist, or maintain pace.
    (4) Adapt or manage oneself."

*Id.* (citations omitted).  To functionally equal the listing, the child must similarly show "'marked limitations' in two . . . or an 'extreme' limitation in one" of the following domains:

>    (1) Acquiring and using information;
>    (2) Attending and completing tasks;
>    (3) Interacting and relating with others;
>    (4) Moving about and manipulating objects;
>    (5) Caring for [one]self; and
>    (6) Health and physical well-being.

20 C.F.R. § 416.926a(a), (b)(1).

###    B.    Factual Background

In K.J.'s early childhood, his mother became concerned about his delayed "speech and language development."  A.R. 253.  She brought him into Children's National Health System for an evaluation on October 23, 2018 (at one year, six months old).  *Id.*  At that visit, an evaluator tested K.J.'s hearing, and his "[r]esults were consistent with normal hearing for at least part of the speech frequency range in at least the better ear, if one exists."  *Id.* (quotation marks omitted).  An evaluator also administered the Receptive-Expressive Emergent Language Test (REEL-3) to test K.J.'s receptive language, expressive language, and language ability.  *Id.* at 254.  K.J. scored below the first percentile on all three.  *Id.*  K.J. would "not stop if someone call[ed] his name," was "not consistently responding to commands," "d[id] not appear to understand the mood of others," reportedly understood only a handful of words, and could say only the word "mama."  *Id.*  On several of the indicators, including articulation, voice, and fluency, the evaluator wrote that K.J. "could not be appropriately assessed . . . due to paucity of output."  *Id.* at 254–55.

Approximately one month later, on November 14, 2018 (at one year, seven months old), K.J. had ear tubes placed in his ears due to recurring ear infections.  *See id.* at 295.  An evaluation of K.J.'s hearing at a follow-up appointment showed "normal hearing in sound field testing," and his mother reported that she felt K.J.'s "hearing ha[d] improved."  *Id.*

A few months after the surgery, on January 7, 2019 (at one year, eight months old), K.J. was given another standardized assessment called the Battelle Development Inventory-2 (BDI-2). *Id.* at 272.  K.J. again scored below the first percentile in both receptive communication and expressive communication.  *Id.*  His overall communication score was in the 0.1st percentile and indicated a sixty percent delay in communication skills.  *Id.* at 272–73.  At that point, while K.J. sometimes (but not always) "respond[ed] to his name by looking up," he did "not yet respond to different tones [of] voices, pay attention to the conversations that go on around him, or follow routine directions."  *Id.* at 272.  He still did not use any words other than "mama."  *Id.*  K.J. was given an Individualized Family Service Plan that included weekly therapy with a speech and language pathologist and an occupational therapist.  *Id.* at 284, 286.

On March 20, 2019 (at one year, eleven months old), K.J. had another developmental evaluation at Children's National.  *Id.* at 310.  The doctors observed, among other things, that K.J.'s "[r]eceptive language skills [we]re broadly delayed and presently appear to be slightly below the [twelve]-month level," and they described him as "nonverbal."  *Id.* at 312.  The doctors diagnosed K.J. with autism spectrum disorder.  *Id.* at 313.  In addition, they recommended that K.J. continue to receive weekly speech and occupational therapy and add applied behavioral analysis therapy, which would "have a direct and positive impact on [his] current functional skills as well as his long-term prognosis."  *Id.*

On September 25, 2019 (at two years, five months old), K.J. was again evaluated at Children's National.  *Id.* at 483.  At that time, the doctor observed that K.J. had "made some progress in the areas of language, socialization, and play skills."  *Id.* at 485.  But the doctor noted that K.J. "continue[d] to demonstrate problematic behaviors, some of which are quite dangerous such as throwing himself down and running away from caregivers."  *Id.*  K.J. was "consistently

using" only two words: "Mommy and blue," and he was "not tuning into spoken language," as he responded to his name only half of the time and could not follow instructions. *Id.* at 484. The doctor estimated that K.J.'s cognitive skills were now "at the [eighteen] to [twenty-one]-month level, which illustrates an improvement of approximately [six] months in as many months." *Id.* at 485. She recommended an increase in weekly therapy. *Id.*

On November 20, 2019 (at two years, seven months old), K.J. was again given the BDI-2 standardized evaluation. *Id.* at 453. He once again placed below the first percentile in both receptive communication and expressive communication, and his skills were at an eight-month and fourteen-month level, respectively. *Id.* at 454. Overall, his communication development was in the 0.3rd percentile, and he exhibited a 64% developmental delay. *Id.* K.J. reportedly made "intermittent[]" eye contact and was "beginning to respond to simultaneous verbal and gestural commands," but was not yet "looking around the room for" family members or objects when named. *Id.* He could consistently say a few more words, including "hi," "uh oh," and "yay," but "primarily indicate[d] his wants and needs by crying." *Id.* He was "not yet communicating in a back-and-forth, turn-taking style or using more than [ten] words." *Id.*

### C.   Procedural History

Ferguson filed a claim for Social Security benefits for K.J. on March 1, 2019. A.R. 152. After K.J.'s claim was denied, she requested reconsideration and a hearing before an Administrative Law Judge (ALJ). *Id.* at 30–50. On June 23, 2020, the ALJ denied K.J.'s application, finding that he was not disabled under the Social Security Act. *Id.* at 13–24.

At step one of the disability evaluation process, the ALJ determined that K.J. had not engaged in any substantial gainful activity. *Id.* at 17. At step two, he found that K.J. had the

following severe impairments: bilateral otitis media status post bilateral myringotomy;[2] delays in receptive and expressive language, pragmatic language, and speech; upper respiratory infection; asthma; autism spectrum disorder; and obesity. *Id.*

But the ALJ found that K.J.'s claim failed at step three, because his impairments or combination thereof did not meet, medically equal, or functionally equal the severity of any listing, including Listing 112.10 for autism spectrum disorder. *Id.* at 17–18 (citing 20 C.F.R. §§ 416.924, 925, 926). The ALJ first concluded that K.J.'s mental impairment did not meet or medically equal the autism listing because his medical record did not show "extreme limitation of one, or marked limitation of two, of the four areas of mental functioning" identified in the listing. *Id.* at 18. The ALJ explained that while K.J. had a "marked limitation" in one domain (ability to interact with others), he had a "less than marked limitation" in the other three areas. *Id.* The ALJ acknowledged K.J.'s history of difficulty with language and social skills, but noted his improvement with therapy. *Id.*

The ALJ further concluded that K.J.'s impairments did not functionally equal the severity of the autism listing. *Id.* at 18–19. In making that determination, the ALJ considered all of the evidence in the record, including K.J.'s medical records and Ferguson's testimony, to evaluate K.J.'s functioning on the six domains. *Id.* at 18–24. The ALJ again concluded that K.J. had a "marked limitation" in only "interacting and relating with others," while he had a "less than a marked limitation" in the other five domains. *Id.* at 19–24. Because K.J. did not have "'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain," the ALJ found

---

[2] This refers to K.J.'s ear infections and surgically-placed tubes. *See* Def.'s Mot. at 3, Dkt. 16; A.R. 591–92.

that his impairments did not functionally equal the listing. *Id.* at 24. As a result, the ALJ concluded that K.J. was not disabled under the Social Security Act. *Id.*

The Appeals Council denied review of the ALJ's decision on March 1, 2021. *Id.* at 1. Ferguson subsequently brought this suit and moved for reversal of the ALJ's decision. Pl.'s Mot., Dkt. 13.

## II.   LEGAL STANDARD

"In a disability proceeding, the ALJ 'has the power and the duty to investigate fully all matters in issue, and to develop the comprehensive record required for a fair determination of disability.'" *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (quoting *Diabo v. Sec'y of Health, Educ. & Welfare*, 627 F.2d 278, 281 (D.C. Cir. 1980)). Once an ALJ issues a decision, the claimant may seek review by the Administration's Appeals Council. 20 C.F.R. § 416.1467. If the Council denies review, the ALJ's decision becomes the final decision of the Administration's Commissioner. *See id.* § 416.1481.

The Social Security Act gives federal district courts review over the Commissioner's final decisions. 42 U.S.C. §§ 405(g), 1383(c)(3). A reviewing court must affirm the Commissioner's decision if it is supported by substantial evidence, *see id.* § 405(g), and if it correctly applied the relevant legal standards, *Butler*, 353 F.3d at 999. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (quotation marks and citation omitted). "Substantial-evidence review is highly deferential to the agency fact-finder." *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008). On review, the "plaintiff bears the

burden of demonstrating that the Commissioner's decision [was] not based on substantial evidence or that incorrect legal standards were applied." *Settles v. Colvin*, 121 F. Supp. 3d 163, 169 (D.D.C. 2015) (quoting *Muldrow v. Astrue*, No. 11-1385, 2012 WL 2877697, at *6 (D.D.C. July 11, 2012)). Further, the reviewing court may not replace the ALJ's judgment "concerning the credibility of the evidence with its own." *Goodman v. Colvin*, 233 F. Supp. 3d 88, 104 (D.D.C. 2017) (quotation marks omitted). Rather, "[t]he credibility determination is solely within the realm of the ALJ." *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012).

### III. ANALYSIS

The ALJ concluded that K.J. did not meet, medically equal, or functionally equal the listing for autism spectrum disorder in part because K.J. had only a marked limitation, not an extreme limitation, in his ability to interact with others. That conclusion was not supported by substantial evidence.

The "interact with others" domain in the autism listing considers a child's ability to communicate with language and make connections. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(E)(2) ("Interact with others . . . refers to the abilities to relate to others age-appropriately at home, at school, or in the community," including "initiating or sustaining conversation" and "understanding and responding to social cues"). The "interacting and relating with others" domain, which is used to determine if a child functionally equals the listing, likewise measures a child's ability to "initiat[e] and respond[] to exchanges with other people, for practical or social purposes."[3] 20 C.F.R. § 416a(i)(1)(i). In this domain, one- to three-year-old children should "be

---

[3] The ALJ analyzed treated these two domains as the same, *see* A.R. 18 (discussion of the domain in listing cross-referencing discussion of the domain in the functional equivalence test), and so do both parties, *see* Pl.'s Mot. at 13; Def.'s Mot. at 9. The Court will do the same, and its conclusion accordingly implicates both the ALJ's analysis of whether K.J. meets the autism listing and whether he functionally equals the listing.

able to express emotions and respond to the feelings of others," "initiat[e] and maintain[] interactions with adults," "interact with other children [their] age," and "communicate [their] wishes or needs" through gestures and words. *Id.* § 416a(i)(2)(ii).

According to federal regulations, a child's limitation is considered "marked" if he has scores between two and three standard deviations below the mean on a "standardized test designed to measure ability or functioning in that domain." *Id.* § 416.926a(e)(2)(iii). The limitation is considered "extreme" if the child's scores are three standard deviations or more below the mean. *Id.* § 416.926a(e)(3)(iii). In addition, for a child under the age of three where test scores are unavailable, a limitation is "marked" if he functions at a level between one-half and two-thirds of his age and "extreme" if he functions at a level one-half of his age or less. *Id.* § 416.926a(e)(2)(ii), (e)(3)(ii). K.J.'s record includes multiple test scores and age-equivalency evaluations that support a finding that he has an "extreme" limitation in his ability to interact with others.

The first such test was REEL-3, which K.J. took in October 2018. REEL-3 is a standardized test that measures receptive language (including "comprehension skills and follow through for directions"), expressive language, and "pragmatic (social) language skills for adult interaction." A.R. 254. Accordingly, it is designed to measure ability or functioning in the "interact with others" domain. *See* 20 C.F.R. § 416a(i) (defining the domain to include language skills). Because the mean REEL-3 score is one hundred with a standard deviation of fifteen, *see* Pl.'s Mot. at 8 (citing Kenneth R. Bzoch et al., REEL-3 (3d ed. 1991)), scores of fifty-five or less indicate an "extreme" limitation under the regulations. *See* 20 C.F.R. § 416.926a(e)(3)(iii). In October 2018, K.J.'s language ability was forty-eight—far below that cut-off. A.R. 254. This score indicates that in October 2018, K.J. had an extreme limitation in language ability.

9

Second, K.J. was evaluated using the BDI-2 in January 2019 (at one year, eight months old). A.R. 272. The BDI-2 "is a standardized assessment battery for children" that measures several things, including cognitive, communication, personal-social, motor, and adaptive skills. A.R. 272, 272–74. The communication skills category thus corresponds to the "interacting with others" domain. In that category, K.J.'s developmental quotient was fifty-five—in the 0.1st percentile. *Id.* at 272–73. Under the regulations, such percentile scores "can be converted to standard deviations" for the purposes of determining the extent of limitation. 20 C.F.R. § 416.926a(e)(1)(ii). In a normal distribution, a score at three standard deviations below the mean corresponds to the 0.15th percentile. Barbara Illowsky & Susan Dean, Introductory Statistics, § 6.1 (2013), *available at* https://openstax.org/books/introductory-statistics/pages/6-1-the-standardnormal-distribution. Thus, K.J.'s 0.1st-percentile communication score is "three standard deviations or more below the mean."[4] 20 C.F.R. § 416.926(a)(e)(iii). Once again, this score shows that according to the regulations, K.J.'s limitation in this domain was "extreme" in January 2019.

K.J.'s estimated age equivalency during that same evaluation leads to the same conclusion. K.J. was twenty months old at the time, yet he had the receptive communication and expressive communication skills of an eight-month-old (two-fifths of his actual age). A.R. 272. In addition, the evaluator concluded that K.J.'s communication was 60% delayed, meaning he was functioning at less than half (40%) of his age. *Id.* at 273. K.J.'s functioning "at a level one-half of his age or less" indicates his communication limitation was "extreme" under the regulatory definition. 20 C.F.R. § 416.926a(e)(3)(ii).

---

[4] This conclusion is confirmed by K.J.'s numerical score on this domain. Because "[t]he standard mean score on the BDI–2 is 100 with a standard deviation of 15," *Boyington ex rel. J.O.J.H. v. Colvin*, 48 F. Supp. 3d 527, 531 (W.D.N.Y. 2014), K.J.'s score of fifty-five is three standard deviations below the mean. *See* A.R. 272–73.

Eleven months later, in November 2019, K.J. was again administered the BDI-2. A.R. 453. At that time, his BDI-2 results for both receptive and expressive communication were below the first percentile. *Id.* at 453–54. Although his overall communication development had marginally improved to a score of fifty-eight (the 0.3rd percentile), the evaluator concluded that he now had a 64% delay in communication skills development. *Id.* at 454. At thirty-one months old, K.J. was displaying the receptive communication skills of an eight-month-old and the expressive communication skills of a fourteen-month-old—both well below half his actual age. *Id.* at 453–54.

While the ALJ noted the first two test scores, the ALJ did not consider the November 2019 evaluation, the most recent score. *See id.* at 20 (citing only the October 2018 REEL-3 and January 2019 BDI-2, but not the November 2019 BDI-2). This was reversible error, as the regulations instruct the ALJ to consider K.J.'s November 2019 test score "together with the other information" in the record. 20 C.F.R. § 416.926a(e)(4); *see also* 20 C.F.R. § 416.926a(e)(4)(iii)(B) ("When we do not rely on test scores, we will explain our reasons for doing so in your case record or in our decision."). While K.J.'s score of fifty-eight (0.3rd percentile) on this test was not *per se* "extreme" under the regulations, it was only "slightly higher than the level provided" in the regulations for extreme limitations.[5] *Id.* § 416.926a(e)(4)(ii)(A). Thus, under the regulations, his limitation might still be extreme "if other information in [his] case record shows that [his] functioning in day-to-day activities is seriously or very seriously limited because of [his] impairment(s)." *Id.*

---

[5] Scores of seventy and below indicate "marked" limitations, while scores of fifty-five and below indicate "extreme" limitations. *See Boyington*, 48 F. Supp. 3d at 531. K.J.'s score was twelve points below the "marked" threshold, but only *three* points above the "extreme" threshold.

The November 2019 evaluation is directly relevant to the ALJ's inquiry. It found that K.J.'s communication showed, among other things, a "[s]ignificant [d]evelopmental [d]elay" and that K.J. "[wa]s not yet communicating in a back-and-forth, turn-taking style or using more than 10 words." A.R. 454. Moreover, the evaluation also reflected that K.J.'s communication skills were extremely delayed compared to typical children his age. Most noteworthily, K.J.'s receptive communication functioning was *almost one-quarter* of his actual chronological age—far below the regulation's cut-off for extreme limitations. *Id.*; *see also id.* (also noting that K.J.'s expressive communication functioning was 45% and overall communication was 60% of actual age); 20 C.F.R. § 416.926a(e)(3)(ii) (explaining that functioning at less than half of one's actual age is an "extreme" limitation). While these age equivalency metrics are not dispositive because K.J. also had a standardized test score in his record, *see* 20 C.F.R. § 416.926a(e)(3)(ii), they constitute "other evidence [that] shows that [K.J.'s] impairment(s) cause[d] [him] to function in school, home, and the community far below [his] expected level of functioning." *Id.* § 416.926a(e)(4)(ii)(A). And they would help the ALJ "compare [K.J.'s] functioning to the typical functioning of children [his] age who do not have impairments," as is required in the evaluation of each domain. *Id.* § 416.926a(f)(1). But the ALJ did not consider them at all.

Indeed, the ALJ's failure to consider the November 2019 evaluation was material, because doing so would have directly undermined his reasoning for why K.J.'s limitation was only marked. The ALJ reasoned that since the October 2018 and January 2019 tests, K.J. had received ear surgery and began weekly therapy—and after those two interventions, K.J. "made some progress in the areas of language, socialization, and play skills." A.R. 20–21 (citing the September 2019 follow-up evaluation, *see id.* at 485). Because of this progress, the ALJ concluded that the earlier scores did not compel finding an "extreme" limitation, despite falling in the regulations' range for

"extreme." *Id.* at 18, 20–21. But the November 2019 score squarely calls that conclusion into question. In November 2019—over one year after his first test score in the "extreme" category, and just one month after some noted progress—K.J. was still scoring in the less-than-first percentile on standardized tests for communication. *See id.* at 454. At the same time, K.J.'s communication skills had worsened four percentage points since the January 2019 evaluation. *See id.* at 272–73, 454.

In sum, the ALJ did not "analyze[] all evidence" relevant to the interacting with others domain. *See Goodman*, 233 F. Supp. 3d at 104. His omission was more than harmless error because the evidence he failed to consider undermines his conclusion; indeed, it flatly contradicts the reasoning he provided to explain why K.J.'s limitation was not extreme. *See Bethel o/b/o C.B. v. Berryhill*, No. 18-cv-00247, 2019 WL 12251881, at *11 (D.D.C. Aug. 29, 2019) ("An ALJ may not simply ignore evidence in the record that might undercut his ultimate conclusion."), *report and recommendation adopted*, 2019 WL 12251879 (D.D.C. Oct. 2, 2019). Because a finding that K.J. had an "extreme" limitation in one domain would be sufficient to conclude that K.J. met, medically equaled, or functionally equaled the listing, 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.10; 20 C.F.R. § 416.926a(a), (b)(1), the ALJ's determination will be reversed and remanded.[6]

Turning to relief, Ferguson asks the Court to order the ALJ to award benefits to K.J. Pl.'s Mot. at 14–15. Although the Court agrees that the ALJ's opinion ignored relevant evidence, that evidence does not "clearly indicat[e]" that K.J. had a disability so as to warrant such an order. *Espinosa v. Colvin*, 953 F. Supp. 2d 25, 36 (D.D.C. 2013). The Court will instead remand the case to the ALJ to reconsider his determination, giving proper consideration to the evidence in the

---

[6] For this reason, the Court need not address Ferguson's additional arguments that the ALJ also erred in the analysis of other domains, *see* Pl.'s Mot. at 10–13.

record, including the November 2019 BDI-2 standardized evaluation, in the "interacting with others" domain.

## CONCLUSION

For the foregoing reasons, the Court grants the plaintiff's Motion for Judgment of Reversal and denies the defendant's Motion for Judgment of Affirmance. A separate order consistent with this decision accompanies this memorandum opinion.

                                                                                 _____
                                                                                 DABNEY L. FRIEDRICH
                                                                                 United States District Judge

November 14, 2022